Terrific. Well, we have argument today in this matter. It you'll see on the clock, we put 30 minutes per side. We want to give each side plenty of time to make their points, but I'm going to say what I always say when I preside. Uh, there is no extra credit or bonus points for using every second on the clock in the ninth circuit. So if you have made your points and you're not getting any questions back, there's nothing wrong with, with, I guess, sitting down or whatever we do on these virtual things. It's okay to be done is what I'm saying. There's nothing wrong with that. And I think 30 minutes is ample time for this matter. And with that, um, I believe Mr. Becker, are we hearing from you first? Uh, yes, Your Honor. All right. You may proceed when ready. Good morning, Your Honors, and may it please the court. Tyler Becker from the Department of Justice on behalf of all appellants. I would like to reserve five minutes for rebuttal. Very well. When Congress enacted the FSL-MRS authorizing collective bargaining by federal employees, it recognized that national security may require agencies to be excluded from the statute's requirements. Thus, in section 7103b1, Congress explicitly authorized the president to exclude agencies and subdivisions if the president determines that national security so requires. Pursuant to this authority, President Trump adopted executive order 14251 and excluded agencies, including the State Department, Department of Defense, and Immigrations and Customs Enforcement from bargaining. The district court below preliminary and joined the executive orders enforcement despite the president's facially legitimate order adopted pursuant to clear statutory authority in the national security context, a context where courts are supposed to give great deference to presidential determinations. The district court did so after finding plaintiffs had raised only a serious question on the merits that the order was adopted in retaliation for federal union's First Amendment activities. Yet the district court failed to address a key element of First Amendment retaliation claims, an error that even plaintiffs do not defend. And the district court should not have exercised jurisdiction at all, given the FSL-MRS's comprehensive scheme for labor disputes that requires bringing claims like plaintiffs in the FLRA with review in a court of appeals, not a district court. Can I ask you on the jurisdictional issue, was that same issue raised in the DC circuit that had two somewhat similar cases as this one? Yes, Your Honor, it is the same issue. Okay. And did the DC circuit, it doesn't seem they addressed that then, they just, that court concluded essentially that it had jurisdiction? No, the DC circuit did not address the issue. I think that in this context where you're trying to determine likelihood of success on the merits, the DC circuit may have thought, and we think is appropriate, if you, if you, if so inclined, that you can just consider whether plaintiffs are likely to succeed on the merits or plaintiffs are likely to succeed or not on their jurisdictional claim. So we're okay with not addressing if you would prefer not to, but I think you have discretion to do either. Well, yeah, I mean, usually when something's jurisdictional, we don't have discretion to avoid that. We have to decide whether we'd have jurisdiction, but it just seemed interesting to me that the DC circuit, I guess, did not address that. Yeah, your honor, the government agrees that it is an interesting question. And I know there's not a Supreme court precedent clearly on point in this. You know, you're, you're thinking more about Steelco and usually you would have to address jurisdiction, but we think, especially in the state posture, we think you can, you can, you can address either the merits or jurisdiction. And either way, we don't think plaintiffs are likely to, are likely to succeed here and the government is, is likely to succeed on getting the district court's preliminary injunction stayed. Okay. Can I ask then on the statute, would it be, you know, the government's position that once the president makes this determination, as he has here, there essentially could not be a retaliation claim. Do you believe there could be in the face of the president making the determination that the statute gives to him? Your honor, the government does not, does not believe that the retaliation claim would succeed here. It's a, it's very different. We don't think that we think the plaintiffs could have a retaliation claim in this context, but it just doesn't exist here. We think this is governed by the Trump versus Hawaii case. And that, that in that case, you have a situation where there may be one reason that the policy was adopted, perhaps for one reason that involved animus, but had other reasons as well, other facially legitimate reasons. And we think in that context, it's the same, same like this context that there, there, there would not be a retaliation claim or retaliation claim would not succeed. Now, could you bring one if there was, you know, direct evidence of animus? I think Trump versus Hawaii leaves that open, but it would be a very, it would be a very limited type of judicial review in the national security context. If I could just jump in, I want to follow up on Judge Bress's questions about the DC circuit, the DC circuit focused on the injury issue. And I was wondering if you could just update us kind of where we are in this case, in terms of, are the CBAs, have they been rescinded or are they still in effect because I know there was some, at least confusion on my part about whether anything had actually happened to rescind these CBAs or to cancel them. Or are they actually still in place or some of them being canceled, kind of, where are we? Your honor, the only agency that has canceled CBA that has, that has canceled, that has canceled CBAs at this point is the state department. They canceled them before the OPM guidance was issued on April 7th, directing agencies to not cancel CBAs once, as litigation proceeded. There was an issue in district court. It was kind of a record. It was a record issue about one division that half of one agency that had canceled a CBA before that OPM guidance issued, but then they put the CBA back in place and it remains in place today and no other agencies have canceled CBAs. Thank you. Well, doesn't that put you in a sort of an interesting position that if you argue that the injunction causes the government irreparable harm, but at the same time argue that it doesn't cause the plaintiff's irreparable harm because the CBAs have not been canceled. I mean, it seems that everything's status quo. So how is the government harmed? Well, your honor, the CBAs have not been canceled, however, besides from the state department. However, the government does not want to have to comply with every provision of the CBA while the CBAs, while this litigation proceeds, the government would like to be able to, for example, in the case of ICE, there's been an issue where ICE would like to be able to have 24-hour legal support to agents on the ground, and they would have to go through midterm bargaining to be able to do that. Now, ICE has also said they don't really think that is covered by the CBA, etc., but the government has many things that it would like to be able to do that it was not able to do with the preliminary injunction in place. So another issue with determining whether there's irreparable harm is that you didn't submit any declarations to the district court, and there are many. There are several that are attached with your motion here, but can we consider those in the context of the Nikin factors? Your honor, we think that you can. We did submit those declarations to the district court when we moved for a stay to describe what harm was actually being caused by the district court's preliminary injunction, and we submitted those same declarations here. Additionally, we don't even know that you need to go there because the district court's order clearly causes irreparable harm to the government, to the president's ability to make a national determination, a statutorily authorized determination in the national security context. This is like a Youngstown. This is in Youngstown, the kind of highest level of authority the president has, where Congress has specifically authorized such a determination, and the president has made it. So we think the president, there's immense harm just to the president's national security prerogatives generally here, and the D.C. Circuit seemed, the D.C. Circuit agreed in the NTU case, and you mentioned the NTU case. Just yesterday, the D.C. Circuit denied rehearing en banc in that case that was assigned on irreparable harm as well. The district court seemed to be bothered by some statements in the fact sheet. So why don't you address those in terms of why you think they don't amount to unlawful retaliation? Yes, Your Honor. So the statements in the fact sheet, the government believes actually get at determinations the statute allows the president to make, even though they may relate to First Amendment activity. The president has a mandate, and the president believes he can go through and try to reform the federal government and reform agencies, including agencies like the State Department that engage in national security work. And the president in the fact sheet was describing those reasons that the statute actually requires him to make. This is like in Yeves, this court's decision in Boquist. This is a determination that, you know, context that First Amendment activity and speech is part of, is going to be part of any determination. And we think that's okay. Now, even if you disagree with us on that, we think under Trump v. Hawaii, even if there was one impermissible retaliatory reason for an action, we think that where there's another facially legitimate reason or other facially legitimate reasons, which we think clearly there are here, the court would still have to state a district court's injunction. The district court took issue with the scope of the executive order, commenting that it's much broader than the executive orders that were issued by prior administrations and covers entire cabinet-level departments. Are there any limits on the scope of the president's authority under the statute to exclude parts of the government from collective bargaining and these labor provisions? I mean, could the president theoretically exclude the entire federal workforce? Your Honor, I'm not prepared to offer today any limitations on the president's authority in this context. And that's not really at all what has happened here. I mean, the president, if you look at the fact sheet that plaintiffs want to rely on, it goes through specific reasons that each of these agencies is engaged in national security work. And we think that courts engaging in determinations on an agency-by-agency, subdivision-by-subdivision level about what agencies are engaged in national security is something we don't really think that district court should be doing. For example, the district court here cited the National Institute of Allergy and Infectious Diseases. Under the district court's reasoning, an agency that is trying to prevent a future COVID-19 pandemic and is engaged in work trying to prevent bioterrorism would simply be overbroad to include such an agency under the district court's reasoning. And under Trump v. Hawaii, overbreadth in this context, in the First Amendment context, is not a reason that you would, because of the deference owed to the president's national security determinations, it's not a reason that you would want to question the president's authority here or that we think the district court had authority to do so at all. Well, I understand that the president did not do what I'm suggesting here. That's a hypothetical. But what I'm getting at is, are there any limits? Are there any handles that we can put on this? I mean, does the government concede that there could be limits? That something that was so broad, such as what I described, would not fit within the president's authority under the statute? Your Honor, the president has to make determinations under the statute that agencies are engaged in, have a primary purpose of national security, counterintelligence, intelligence, or investigative work, and that applying the provisions of the statute would impair national security. We think that if the president makes those determinations, they're unreviewable beyond that. I'm sorry, go ahead. We think this follows from the D.C. Circuit's AFG-E v. Reagan decision from 1989, where the court said the president made those required determinations, and that was it. So, your friend on the other side has argued in their response that Trump v. Hawaii doesn't apply because that was in the context of admitting persons into the United States versus domestic issues. It was in that context, that's correct. Is that a distinction we can or should draw to limit national security concerns to foreign matters or persons entering the country? We don't think so, your Honor. And for this reason, we think that the way the court reasoned in that case is that, yes, it involved admitting foreign nationals, but it also was the national security concerns with doing so that were animating that decision. And we think that the Supreme Court's decision is broader. And regardless, even if you disagreed with us on that, we also raised that under the typical First Amendment retaliation standard, there would be sufficient significant deference owed to the president in this context. We think that's the Webster v. Doe case, but also AFG v. Reagan, and that there would still be significant deference to the president. The district court did not respect that deference at all, and in fact forgot an entire part of the First Amendment standard, which in the retaliation context involves whether asking after plaintiffs have pled their prima facie case, whether the government would have instituted the same policy regardless of the retaliatory, alleged retaliatory intent. Can I ask a little bit different question? The district court here relied on the serious questions aspect of framing of our preliminary injunction test. Does the government have a position on whether that test is consistent with the winner factors? Your Honor, the government does not believe that test is consistent with the winner factors. However, under this court's precedent, we do think that the panel has to consider the district court's order using that standard. However, the district court's order, it sort of mentions that in order to apply serious questions under the Alliance for Wild Rockies v. Cottrell case, that the equities then have to sharply tip in the favor of plaintiffs. We just don't think that happened here at all, but yes, the government would like to preserve for further review that the serious questions doctrine is inconsistent with the winner factors, and we raised this issue in the district court as well, but the district court told us that this was a longstanding Ninth Circuit rule and proceeded to apply the standard in this context, and we don't even think under, as I mentioned, we don't even think under the actually Ninth Circuit precedent, given that the equities don't sharply tip in favor of plaintiffs here, especially given the district court's order really impeding on the president's national security prerogatives. So yeah, recognizing we're bound by Alliance for the Wild Rockies, what is the government's reason for why the serious questions test is inconsistent with winner? Your Honor, the reason is that you have to show a likelihood of success. If you look at the district court's recent precedents, including the Starbucks case last term, you have to make a showing on each of those factors, and the Ninth Circuit has specifically said in a case we cited in our brief, another Alliance for the Wild Rockies case in 2017, that the likelihood of success, the serious questions doctrine is a lower standard than likelihood of success, and frankly, under Supreme Court precedent, that is, and very clearly decided in the Ninth Circuit, that is not sufficient to show likelihood of success, especially when the court has recognized that it's actually a lower standard. Your Honor, if I may, I want to talk a little bit about the jurisdictional question here. We think that this court, that the district court did not have jurisdiction, and we've talked a little bit about that, but we think the Thunder Basin factors, and especially the Supreme Court's Elgin decision, clearly mean that the district court did not have jurisdiction here. There are many ways plaintiffs could have raised these claims inside the FLRA. They could have filed a charge with the FLRA, whose general counsel would then investigate, have to investigate the charge. They could have filed a grievance with an arbitrator, and even though we've advocated staying some of those arbitrations or holding them in abeyance, we're still complying with them and showing up with them at this point. We also, the plaintiffs could have also raised a post-dismissal in one of the pending FLRA matters involving these particular agencies. There's, the Thunder Basin factors require you to show that in order for a district court to have jurisdiction, plaintiffs would have to show that not giving the district court jurisdiction would foreclose all meaningful judicial review. The suit would be wholly collateral to the statute's review provisions, and the claims would have to fall outside the agency's expertise. We think on each of those prongs, plaintiffs have not made such a  And ultimately, everything here in this case can be remedied at the end by the FLRA. So we're not, so we just don't think that there was jurisdiction at all in the Thunder Basin factors. And plaintiffs don't even really mention or make this argument, but a lot of times, plaintiffs make an argument that, oh, the FLRA or some agency couldn't really consider constitutional questions like we're considering here, but the FLRA considers constitutional questions all the time, and does so in the context of reviewing arbitration awards for compliance with law. In our reply brief at page 6, we discuss that. In the Supreme Court, in the FLRA proceedings involving the Supreme Court's recent Ohio adjudicant general case involving the Ohio National Guard, the FLRA had to consider the militia clause and whether that applied. So we think this is clearly within the agency's expertise, even on the constitutional questions. And ultimately, plaintiffs' claims are really statutory questions about whether the government has to comply or is appropriately complying with the collective bargaining agreements at issue here. What about the fact that some agencies filed lawsuits basically seeking declaratory judgments in federal court? Your Honor, those lawsuits we think are fundamentally different from what could not have really been brought in the FLRA. But regardless, that has nothing to do with this court's jurisdiction. Those lawsuits, that would require us to assume that those lawsuits are going to succeed. There's currently pending motions to dismiss in the case in Texas that plaintiffs cite. We think that the district court said, oh, it might be unfair if plaintiffs couldn't bring something in the FLRA as a result, but the government thought it could. But that has nothing to do with jurisdiction. We think those two things have to be considered separately. Why doesn't it have to do with jurisdiction? Doesn't it seem like the government obviously takes a position that there is jurisdiction in the Texas case, but there's not here. So what else does it go to other than jurisdiction? This is more of a policy choice that Congress has made. If you look at the Elgin case, Congress has made the policy determination that plaintiffs have to bring their claims inside of the FLRA and work that out to a court of appeals. And we don't think that it matters whether the government can bring a district court suit at all. We think that's more of a policy argument about what should happen than if the government, whether it's fair to plaintiffs, then whether it actually goes to jurisdiction. So, yes, it relates to jurisdiction, but in terms of whether it's more of a policy thing, not something that the government has to So if the government had filed this same case that we're talking about, if the government was the plaintiff and filed a declaratory judgment against the union, your position would be there's jurisdiction over that? Your Honor, the case would be a little bit different because we would be asking for a declaratory judgment that we could cancel the CBAs. The government, we think, has the ability to file such actions to avoid all the problems that would be caused by canceling the CBAs. I mean, there's a lot of reasons the government hasn't cancelled the vast majority of CBAs here, just because that would cause a lot of remedial problems, potentially subjecting the government to significant amounts of damage, etc. Well, Mr. Becker, if you don't have any other points to make, and we don't have any questions, I know you wanted to save around five minutes. Would seven and a half work? That works for the government, Your Honor. Good morning, Your Honors. May it please the Court. This case involves a challenge to an executive order that eliminated statutory labor law protections and collective bargaining rights for approximately two-thirds of the federal workforce. As the District Court found in its preliminary injunction order, this executive order is unprecedented in size and scope from prior exclusion orders under 7103B, and that overbreadth is combined with some peculiar line drawing that resulted in bargaining rights for some employees at an agency, while maintaining bargaining rights for some employees at an agency, while maintaining them for other employees who work at those very same agencies. The rationale for this order was explained in a fact sheet that was published by the White House along with the executive order, which stated that it was targeted at federal unions who had engaged in speech and petitioning activity critical of the President's agenda. Based on the unprecedented scope of the order, the rationale that was set forth in the fact sheet and uncontested factual submissions demonstrating irreparable harm suffered by the plaintiffs and their members, the District Court granted plaintiffs a motion for a preliminary injunction. That injunction would maintain the status quo labor relations framework that has existed since 1978 and that the defendant agencies here have been operating under since 1978, pending resolution of the government's appeal of the PI, which is proceeding on an expeditious schedule, opening briefs are due next week. The defendant's stay motion does not demonstrate error in the District Court's analysis, nor do their newly submitted declarations establish the type of irreparable harm that would warrant a stay pending appeal of the PI. I'm going to, since jurisdiction was brought up at the end, but because it is jurisdiction, I will start with that. The government's jurisdictional argument was correctly rejected by the District Court as it was also rejected by the District Court in D.C. in the NTEU case that Judge Bress referenced. The government's argument here is that even though the plaintiffs and their members are no longer covered by Chapter 71, the statute that creates the FLRA and that defines the scope of the FLRA's jurisdiction, plaintiffs and their members no longer have rights and protections under that statute. The agencies are no longer covered by that statute and have no obligation to comply with the terms of that statute. Nevertheless, the statutory scheme that only extends to parties within the scope of the statute is the exclusive forum for the plaintiffs, but if the government wants to seek review of the validity of the executive order, it is free to bring that claim in federal District Court. That would be an unprecedented application of the channeling doctrine and therefore it was correctly rejected. Channeling is a question of congressional intent and there is nothing in the statute that suggests Congress intended for the FLRA to exercise jurisdiction over non-covered entities, nor to set up an unbalanced scheme where only union claims are challenged and government claims are not. That is not the FLRA's authority. If there are covered entities bringing covered claims whether it's the union or the agency, those go to the FLRA and that channel is closed otherwise. That statutory scheme is not available to the plaintiffs here and therefore the District Court correctly found, just like the D.C. Circuit in the Nicholson case that we cited in our brief, when an executive action takes a matter outside of the FLRA's purview, which is what has occurred here with this executive order that excludes these agencies from the coverage of Chapter 71, it is appropriate for a challenge to the legality of that executive action to be brought in federal district court. The government, in its reply, essentially said, well, your position is that your clients are covered by the statute and you believe the executive order to be unlawful and so you should therefore be required to pursue the FLRA remedial scheme in light of that. There's a bit of a tail chasing problem with this particular issue, so how do you respond on that point? The case that the government cites in support of that is a case that involves standing and particularly involves regressibility where the court does assume whether the plaintiff is going to succeed on the merits in order to determine whether the injury that's asserted is regressible for Article 3 standing purposes. Channeling those, that is a matter of congressional intent. Did Congress intend that this is the type of claim for which that should go to the administrative agency first? That congressional intent is lacking here because the statute does not grant the FLRA jurisdiction over entities that are outside the scope of the statute and it doesn't provide whether it's the union or the agency if it's a non-covered entity then the FLRA lacks authority to decide any claims that are brought by non-covered entities. Doesn't your argument assume that the executive order is valid and that the government prevails? It seems that the issue that would be before the FLRA is the very crux of the issue. Is it valid? Are these agencies and departments excluded? Are these employees excluded? That the FLRA would not assume that to be the case but that would be the question presented to them and if that is so, why is that not within their purview and their expertise? The reason it's not within their purview is the fact that it wouldn't have jurisdiction to decide a claim against one of the defendant agencies here because that agency is excluded and that's what we've seen in the past. You're saying the same thing. My point is that you're assuming that's the case but that would be the very issue. Is it within their jurisdiction? Are they excluded? The very question you presented to the district court would be the very question you would present to the FLRA. Why the FLRA would lack authority to decide that claim is that the question of the scope of presidential exclusion of an agency under 7103B is not a matter that's committed to the FLRA. The FLRA decides labor management disputes and it's enumerated in the statute, particular provisions of the statute. 7103B does not give the FLRA the authority to review the president's invocation of that exception and exclude an agency from the coverage of the statute altogether. But you think that it does give the district court the ability to review the president's national security determinations. It gives the district court the authority to review the constitutional challenges to the president's invocation of 7103B. And that's the issue that the district court found that's before the court here is a First Amendment claim. And courts absolutely have the ability to review whether presidential action violates the First Amendment. So maybe walk through what is the evidence of First Amendment retaliation. So the primary evidence of the First Amendment retaliation comes from the White House's own statements that is published in the fact sheet. So that fact sheet was the rationale for this very executive order. It's not an extrinsic statement or an unconnected statement. It is the president's official document published by the White House. What specific statements in it are the troubling ones to you? The ones are the, first of all, the reference to, so the fact sheet refers to hostile federal unions. And then it goes on to explain what the hostility of that act is where it states that it references the largest federal union which is plaintiff AFG so it's referenced directly in this. It describes itself as fighting back against Trump. The words fighting back are in quotes in the fact sheet because that's taken from an article that AFG published on its website where it detailed various First Amendment activity that it is engaged in such as filing lawsuits, lobbying members of Congress, engaging in public speech that is critical of various policies that the administration has been pursuing. It also calls out plaintiff NNU, one of the VA's unions for filing grievances against President Trump's policies. So it directly references First Amendment activity by the plaintiffs in this case. And it goes on to say that in the closing words of that fact sheet President Trump supports constructive partnerships with unions who work with him. And therefore makes clear that the dividing line between which unions are okay and which aren't when we're going to allow collective bargaining in this agency and when we're not is whether or not the union that represents the employees in those agencies have expressed sufficient support or at least not expressed opposition to the President's agenda. That's First Amendment retaliation. That's drawing a line and punishing those federal unions who have engaged in speech and petitioning activity critical of the President. And that is First Amendment speech. What do we do with the fact that the statute allows the President to make a national security determination and he did that? And that doesn't seem to be reviewable. Well we would disagree that it's not reviewable. But we don't have to even get into that's a different claim that the plaintiffs have brought below which the District Court because he ruled on First Amendment grounds didn't reach. But the First Amendment question is first of all is not reviewable and here I think the reason in the government's presentation they referenced Trump v. Hawaii several times and that case is distinguishable for multiple reasons. But one of them is that what the court was looking at in that case is when you had a facially neutral rationale set forth and the court looked at can we look behind that facially neutral rationale and to see whether and cast doubt on the stated rationale based on other statements and other evidence, extrinsic evidence. That is not the situation here. We're not asking we don't need to look behind any stated motive. We don't need to infer or speculate or guess from various pieces of evidence that we're putting together. The improper motive is set forth in the very explanation of the executive order. So we don't need to look behind the rationale. To make that statement you're saying that the fact sheet is the rationale for the executive order. But the executive order itself is facially neutral as it was in Trump v. Hawaii and I think that's the issue in Trump v. Hawaii they're talking about looking beyond the executive order to statements things posted on websites etc. Some before the president was president when he was a candidate here you're looking beyond the executive order to the fact sheet. I think you've referenced the frequently answered questions as well but it seems that you're really focused on the fact sheet. But that's not part of the executive order. So aren't we looking beyond the facially neutral executive order at that point? So we would not characterize the executive order as facially neutral. So the executive order on its face says it is eliminating collective bargaining rights at a large swath of agencies. But within that very order it then carves out and maintains collective bargaining rights for other employees at those very same agencies specifically law enforcement employees except for law enforcement employees who work at the Bureau of Prisons where plaintiff AFG represents all of the bargaining unit employees at the Bureau of Prisons. So there are suspect features on the face of the executive order itself. And here the fact sheet is not the type of extrinsic evidence that the Supreme Court was referring to in Trump v. Hawaii because it was published alongside this executive order and it calls itself the fact sheet for the executive order. So it is directly connected and on its face states that it is the official explanation for this executive order. How is this not just questioning the line drawing on the national security side of the House? It seems that it inevitably just falls back into that. You see that in the district court order too where the district court says I'm not questioning this but that at times it does appear that the order does question it. But the what the district court did was find and what we are seeing here as well is that First Amendment retaliation is not, that's not national security and that's not a valid basis by which government action can be taken. In the Arizona Students Association case from this court which we cited in our brief as well as in the Boquist case that the government cites. In both cases this court makes the point that the fact that an action could have been lawfully taken, it is still unlawful if it is done so on First Amendment retaliation grounds. So any argument that some of these agencies maybe could have been excluded or not or that the president could draw lines in certain ways that's not, there's a threshold problem here though because here those lines were drawn on the basis of First Amendment speech as retaliation for First Amendment speech which is unlawful, that is unconstitutional. But I have to go back to what Judge Bress just asked you. How is that not weighing the president's determination on national security? I mean the language in the district court's order, preliminary injunction order talks about the scope of the executive order and that certain agencies that are listed don't appear as if they have anything to do with national security. That just seems to me to be naked, unvarnished, straightforward reweighing the president's national security determination whether an agency impacts national security or not. I don't know how we view it as anything else. Even your scope argument that you're talking about, that seems to fall clearly within the president's authority to make a national security determination. So first of all, the scope argument that I'm making as what the district court opinion did as well is that that points out that there are suspect features on the face of the executive orders. I think that raises a question. The fact sheet then tells us what is going on here. Why is it that you have... I think the point is when you say there are suspect features, i.e. these are not really national security determinations, meaning we're reweighing whether they are in fact national security determinations. That's the whole problem that I'm having with your argument. So please explain to me why I'm wrong. Let me step back and put the statute in context, which I think is important here. 7103B is an exception to a congressional statute that found that it is... These are set forth in 7101, the purposes which Congress laid out when it passed the statute, where it found that collective bargaining and labor organizations in the federal workforce increases efficiency within the federal government and having labor organizations is in the public interest. Therefore, we are providing collective bargaining rights across the federal government. 7103B then is an exception that when those two national security criteria are met, an agency or subdivision can be excluded. Under just general principles of statutory interpretation, that exception cannot be read in a way that swallows the entire rule. That's what, at least in the government's presentation, I think in response to your question, Judge Beatty, about whether there are any limits here. The government's interpretation is that the president can declare anything to be national security and that's the end of it. What does any of this have to do with the First Amendment? This is looking at B-1 and trying to ask can the president essentially exclude all employees? He hasn't done that here, but there's some reason to think about what would happen if he did. But even so, that's that issue. The issue before us is the argument that there's First Amendment animus that's so powerful that we should undo this. Right, and my argument on the First Amendment animus is what I stated before. The First Amendment animus here is stated outright in the official explanation of the executive order and that's what the district court cited and relied on and that provides the motive. There's no further inferences. Why wouldn't we read the statements just as part and parcel of the national security rationale? Because that would then mean that we're defining national security to mean political allegiance to the president, political support of the president's agenda. If it were a threat to national security for domestic organizations to engage in public criticism and opposition to the president's policies through constitutionally protected avenue, we're talking about filing lawsuits, making public statements, using the statutory provisions that are granted. These are legal, constitutionally protected avenues to engage in speech. That cannot be seen as the threat to national security. That runs right into the First Amendment. So you pointed to bullets, I think, in the fact sheet. What would have happened if the fact sheet just hadn't had those two bullets? Well, it's not two bullets. It's more than that, but just to answer your Honor's question. Well, let's just pin that down, actually. I mean, I see the fighting back. I see the VA union. What else in here is part of the evidence of First Amendment retaliation beyond those two? Prior to that, it states that the CSRA enables hostile federal unions to obstruct agency management. So you just think the word hostile, that's retaliation? No, it's then explained what is the hostile action, and that's what's explained in the bullet points that I was referencing. After that, there's also the closing lines that states outright that partnerships that unions will be tolerated if they will work with the president and those will not be tolerated. That's also at the end of the fact sheet. There are multiple provisions of the fact sheet that demonstrate the retaliatory animus. Let's just imagine those were taken out. Would you still be arguing that there's First Amendment retaliation here? I think that would be a different case. I think then it would be a circumstantial evidence case rather than a direct evidence case as we have here today with these fact sheet statements. The First Amendment analysis may be different there. If there was an executive order that was issued, and this court has said in the Arizona Students Association case that First Amendment retaliation can be shown by either circumstantial evidence or by direct evidence. If you had the unprecedented size and scope and the extraordinary over breadth of the executive order, if you had the carve-ins and carve-outs which raised questions as they did here, the law enforcement carve-in, the Bureau of Prisons then carve-out where AFG represents the bargaining unit employees, that could still raise a First Amendment retaliation question. It would not be the same case. This case is much stronger and more straightforward because we have direct evidence of what the motive was for this executive order which was published in an official document put out by the White House. Let me jump in here. Let's assume I agree with everything you've said so far. Every single word. What do we do with the fact that the district court did not address what I'll call the Mount Healthy issue, which is that even if everything you said is true, the president may have just done this anyway. If that's the case, what's your response to the fact that the district court didn't address that? The district court did say that after going through the fact sheet statements, it did say that the national security does not rebut that. I do want to point out what the posture was in the district court. The government did not put in any evidence to support what is an affirmative defense under Mount Healthy as well as this court's case law. Once a prima facie case of retaliation is shown as a substantial motive, the burden shifts to the government to establish as an affirmative defense that they would have done the same thing anyway. We don't think that can be established here. The district court did point out, it referenced the very piece of the fact sheet that I was pointing to as well, which is the closing words. What the district court says is that it condemns unions who are critical of the president and supports the unions who will toe the line. That's what shows that even if the government had attempted to make a showing before the district court, which it did not, that it would have taken the same action anyway. That negates any such showing. What the government argued in its day motion here is that the district court failed to consider its additional evidence. The government put in zero evidence at the preliminary injunction stage. So there is no error by the district court in not considering additional evidence. There was none before it. And the district court did look at, it went through the First Amendment retaliation elements and then it also found that the national security statements did not rebut the nexus that the plaintiffs had shown. That nexus between the adverse action taken and the First Amendment speech. And so it properly applied this court's First Amendment retaliation analysis. But can you tell me, again I don't want to harp on it too much, but looking at the district court's order, I don't see the Mount Healthy standard cited. Maybe I missed it. But I didn't see it discussed. And look, there may be reasons why the government certainly could have handled this better. I'm not arguing with you on that. But I didn't see the district court say what you just said. So it didn't cite Mount Healthy, but it says on page 20 of the order, the invocation, so this is after going through the fact sheet statements and finding the invocation of the national security exception in section 7103B1 does not necessarily rebut this nexus as the government would have it. So you think that's...but then it goes on to talk about second-guessing national security terms. Okay, I see your point. And I'm not going to try to force you to concede something, but in response to my question, that's the best part you would point to. Yeah, and I would point out that, yes, it starts with that, but then it goes on again and it discusses the additional, the scope of the executive order, the line drawing. So the district court was looking at all of that evidence and weighing it there. The final point I'll make on in my remaining time in terms of...I just wanted to say a word on irreparable harm. So the injunction here returned the agencies to the same labor relations framework that has been in place since 1978. It should be dispositive of the government's argument that none of the declarations that they've proffered to this court, which was not proffered, again, during the preliminary injunction record, does not cite a single example of something that has happened in the past 50 years where an agency's compliance with a collective bargaining agreement harmed national security. And there's an obvious reason for that, which is that the statute already provides substantial flexibility in this area, including an emergency exception that permits an agency to take whatever actions may be necessary to carry out the agency mission during emergencies. The statute also excludes altogether from the bargaining unit any employee whose work directly affects national security. The statute allows for the suspension of an employee when an agency head finds it necessary in the interests of national security. So the framework that the injunction put back in place and the situation that the agencies are addressing is engaging with labor unions which Congress found are in the public interest about workplace matters in non-emergency situations on behalf of non-national security employees. That's the status quo that the preliminary injunction put in place. And the allegations of harm... So you say it puts back in place the status quo of dealing with non-national security employees, which means we're making that determination as opposed to the president? No, I'm sorry. So what the statute provides is when a labor organization is certified as exclusive rep in the first place, the bargaining unit, so the employees who had collective bargaining rights and who then lost them under the executive order, there had already been the determination made that their work does not directly impact national security because they could not be part of the bargaining unit if that were the case. The situation's not static, right? You keep referring to 1978. Everything in the world is different thanks to changing. So I'm not sure how powerful it is to argue that this is the status quo for 50 years because statute in its provisions recognizes that the national security situation changes and the president needs to have the ability to react quickly and issue executive orders to do so. So why is what was happening in 1978 or when President Carter issued an executive order exempting various agencies, why is that relevant to what's happening now? What's relevant is that it has existed for 50 years. So it was what was in place in 2024, 2023, 2022, and prior to that. My point is that in terms of the allegations of irreparable harm that the declarations that the government relies on here and that they've proffered here, the assertions that are made in those declarations are the scenarios, the hypothetical scenarios that are put forth in there are ones that the statute already provides for, and therefore there's no explanation provided or even any accounting in those declarations that there are these other statutory mechanisms which would still exist under the preliminary injunction. Can I just ask a logistic question? You mentioned the briefing schedule. When will the briefing be complete on the, not on the emergency motion, but on the actual PI? The government's brief is due a week from Friday and then our brief, I should have the exact, I should know the exact date. I believe it's 30 days after that. And what's happening in the district court? So the district court was scheduled to be having the initial case management conference while we're here talking right now. The district court took that off the calendar as a result of the appellate proceedings, but the party submitted their joint case management statement last week in advance of what was to be the case management conference today. That schedule provides for summary judgment briefing beginning, I believe, in August. Is there a discovery that's contemplated? As of right now, there's no discovery that's been proposed. The parties haven't exchanged initial disclosures yet, and what the joint case management statement provided is that there will be a summary judgment, depending on what witnesses may or may not be identified by the government in their initial disclosures. But as of right now, there's no plan for, there's no contemplated discovery. So is the summary judgment just going to be essentially a redo of what we've already seen on the PI? It's the same record? It's going to be the same issues? The record may have, because things continue to be happening at agencies, so there may be, I think there will be but there are additional claims that the plaintiffs had, which the district court did not address in the preliminary injunction motion. So the additional claims would include that this was essentially beyond the statutory power because it was too broad? The basis isn't that it's too broad, but it's not the only basis, but yes, there is an ultra vires claim that the plaintiffs have raised in this case, which was not addressed in the preliminary injunction opinion. What are the other claims? So there's ultra vires, there's First Amendment, what else? There's a Fifth Amendment claim as well relating to the abrogation of contracts, as well as a Fifth Amendment procedural due process claim, which were part of the preliminary injunction motion, but were not reached by the district court. The district court described the First Amendment claim as the strongest issue for the plaintiffs if I'm recalling the order correctly. The district court did say that, and I should add as well we had two First Amendment claims, First Amendment retaliation as well as First Amendment viewpoint discrimination, and the district court did not reach the second First Amendment, the second part of the First Amendment claim. Anything else? Anything else for my colleagues? No, Your Honor, I see I'm over time as well. Thank you. Thank you very much. Alright, counsel for the government. Thank you, Your Honor. I want to start just briefly with jurisdiction. This is clearly a situation where Congress intended the FLRA to hear these claims. The FLRA has authority to hear any claim that an agency has violated the FSL-MRS. That's in 5 U.S.C. 7105 and 5 U.S.C. 7116 8A8. This is clearly such a claim. Plaintiffs are saying that the government has to comply with these collective bargaining agreements and the government is saying that it doesn't. We should also mention that all of the relief that plaintiffs are asking for here can be received from the FLRA after this litigation proceeds or from a court. I want to go back to the First Amendment claim. Plaintiffs intend to read and add words to the district court's order that I don't think are there. The district court did not cite the unhealthy standard despite us raising this in our brief which is a brief in opposition to their temporary restraining order because the procedural posture of this case is that the district court turned that into a preliminary injunction. Plaintiffs cannot ask this court to add on that reasoning. That just is simply not there. They didn't mention that in their brief, so now they say that the word rebut somewhere in the opinion mentions that, but I just don't think that's the case. Regardless, even if the district court had appropriately considered whether there was evidence to rebut, whether the government would have adopted the executive order anyways, that doesn't really matter here because the government had clearly facially legitimate reasons for adopting the order. Judge Beatty, you were mentioning that the executive order is really facially neutral. It's just a fact sheet that was published by the White House Press Office that included the statements plaintiffs are mentioning. We think that that Press Office statement is actually helpful to explaining some of the reasons for the agencies being included here. However, that's not something that plaintiffs have really even alleged the President ever saw. We think that's clearly extrinsic evidence here. Plaintiffs said over and over again that they had direct evidence here. We don't think that's the case at all, given that the executive order itself is facially neutral and the basis of the First Amendment retaliation claim appears to just be what was in the fact sheet, which is not contained within the executive order. How about on the face of the fact sheet, the other side points to some statements, hostile federal unions and fighting back and the last bullet point and a few other points. Yes, Your Honor, we think the President can appropriately consider such things when determining whether agencies should be exempted from the FSL-MRS requirements. And the reason for that is simply that the President has the ability as the Commander-in-Chief to determine whether his plans to try to make national security-involved agencies more efficient and more responsive and better able to plan for national security emergencies in the future. We think that the President has the ability to consider what plaintiffs complain about, even though those things may involve some First Amendment-protected activity. We think this is a context like Nieves and Boquist, where there is legitimate consideration of whether particular union activity and complying with the FSL-MRS requirements would impede the President's policy agenda. Counsel, let me jump in on that. This is where I get a little bit concerned about the government's position in this case. So if a President says, I'm the national security President so therefore if you don't like me, you're against national security, so I'm going to cancel any contracts if you don't like me because I'm the national security guy. Is that what you're saying he could do that? Your Honor, what the government is saying here is that if the President has a facially legitimate reason for excluding certain agencies here, which we think is very clear from the fact sheet, that that is sufficient to defeat a First Amendment retaliation claim. We're not going further than that in saying that the President can just exclude whatever he wants. There would be some limited judicial review and we just think it would be governed by the Trump versus Hawaii standard where you would look at whether there was a legitimate interest involved. Your Honor, the District Court's order has caused irreparable harm to the government. There were some questions about whether some of the declarations were properly submitted. We think they were because we were trying to show that there was a stay. A stay was necessary from the District Court. But regardless, the government did not need to present its own evidence in District Court on that fourth prong of the retaliation test under Mt. Healthy. The government relied in Docket 44 at around pages 33 to 35. The government relied on evidence that was in the plaintiff's own record to rebut that, including the fact sheet, including that many of the collective bargaining agreements had been renegotiated in the prior administration to try to disrupt the current administration's policies. And then at S.A. 60, which is in plaintiff's supplemental appendix, they mentioned that we never mentioned any time in the last 50 years that the president's national security has been hampered by this, by bargaining. Actually, there's a good example on S.A. 60 about ICE not being able to modify its cybersecurity policies without bargaining. It couldn't exclude Gmail or web-based mail services, even though those were compromising security. We think the District Court's order is a significant intrusion on the president's national security prerogatives and should be stayed pending appeal. And with that, the government rests. Any other questions from my colleagues? All right. Seeing none, I want to thank both of you for your advocacy in this case and the excellent briefing and we appreciate the very quick turnaround around July 4th. Sometimes we all got to do that and I want to appreciate your prompt attention to this matter. For that, I guess the last thing I'll say is this matter is now adjourned, submitted, and we will go into conference. Thank you.
judges: OWENS, BADE, BRESS